521 S.E.2d 801

**Barbara WALKER and Teressa Dell Walker, Plaintiffs,**

v.

**Don MEADOWS, Sheriff of Mercer County, and the Mercer County Commission, Defendants.**

No. 25369.

Supreme Court of Appeals of West Virginia.

Submitted Jan. 13, 1999.

Decided July 15, 1999.

Benjamin B. White, III, Princeton, West Virginia, Attorney for Plaintiffs.

W. Randolph Fife, Ancil G. Ramey, Steptoe and Johnson, Charleston, West Virginia, Attorneys for Defendants.

PER CURIAM:

Sheriff Don Meadows of Mercer County and the Mercer County Commission present two certified questions concerning the Governmental Tort Claims and Insurance Reform Act, the public duty doctrine, and the application of the special relationship exception to the public duty doctrine. The underlying civil action, styled Barbara Walker and Teressa Dell Walker v. Don Meadows, Sheriff of Mercer County, and the Mercer County Commission, originated in the Circuit Court of Mercer County, Judge David Knight presiding. We decline to answer the first question based upon our determination that an answer to that question is not necessary to a decision in this case. We answer the second certified question in the affirmative.

## I. Facts

On August 8, 1994, Mr. Gary Garland Walker, the father of plaintiff Teressa Dell Walker, filed a mental hygiene petition concerning his daughter Teressa, and an order was entered directing the Sheriff to take custody of Teressa and deliver her for an evaluation.[1] Commissioner John Williams personally telephoned the sheriff's office and was informed that a deputy sheriff would not

---

1. Mercer County Mental Hygiene Commissioner John Williams had interviewed the family of Teressa Walker at Southern Highlands, a mental health facility, and had signed and issued to order requiring the sheriff to take Teressa into custody and transport her to Southern Highlands.

be available to execute the order until after dark. Therefore, based upon Teressa's fragile mental health, her paranoia, and her family's concern that she would be extremely frightened by the approach of law enforcement vehicles toward her home after dark, the family decided to delay the execution of the order until the following morning.[2]

In the early morning hours of August 9, 1994, Teressa's brother waited with Teressa at her home and learned that she was placing her photographs and other property in trash bags and planned to take her "trash" to the landfill. After a period of waiting for law enforcement officials to arrive to serve the order, Mr. and Mrs. Walker telephoned Southern Highlands to determine whether the mental health facility had any explanation concerning the failure to serve the order. In response to the Walkers' inquiries, representatives of Southern Highlands thereafter telephoned the sheriff's office and were informed that the sheriff's office did not have a copy of the order in its possession. Teressa's family then drove to Southern Highlands to obtain a copy of the order and delivered it to the sheriff's office by approximately 9:00 a.m. While present at the sheriff's office, Teressa's family once again emphasized Teressa's suicidal intentions and requested immediate assistance from the sheriff's office. No deputies arrived at Teressa's home.

At approximately 11:40 a.m., Teressa was injured in a motor vehicle accident,[3] and the driver of the other vehicle was killed. A personal injury claim was thereafter filed by the Walkers, premised on the delay of the Sheriff in the execution of the order and the failure to execute the order by the time of the accident.

The lower court subsequently denied the Sheriff's motion for summary judgment, and the following two questions were certified to this Court:

1. Whether the "special relationship" exception to the "public duty doctrine" extends beyond the assertion of immunity under *W.Va.Code,* 29–12A–5(a)(5) (1986),

involving "the failure to provide, or the method of providing, police, law enforcement or fire protection," and can be applied as an exception to immunity under *W.Va.Code,* 29–12A–5(a)(3) (1986), involving "execution or enforcement of lawful orders of any court?"

The lower court answered that first question in the affirmative. We decline to answer that question based upon our determination that an answer is not necessary to a decision in the this case.

2. Whether a "special relationship" can be established under Syl. Pt. 2 of *Wolfe v. City of Wheeling,* 182 W.Va. 253, 387 S.E.2d 307 (1989), and its progeny, which requires "(1) an assumption by the local governmental entity, through promises or actions, of an affirmative duty to act on behalf of the party who was injured; (2) knowledge on the part of the local governmental entity's agents that inaction could lead to harm; (3) some form of direct contact between the local governmental entity's agents and the injured party; and (4) that party's justifiable reliance on the local governmental entity's affirmative undertaking," where

(a) there was no contact between the local governmental entity's agents and the injured party, but there was contact between the local governmental entity's agents and the injured party's parents; (b) where there was no reliance by the injured party on the local governmental entity's affirmative undertaking, but there was asserted reliance by the injured party's family on the local governmental entity's affirmative undertaking; and (c) where the injured party was the subject of an outstanding involuntary commitment order at the time of the contacts between the local governmental entity and the injured party's family?

The lower court answered the second question in the affirmative. We also answer in the affirmative. The essential foundations

---

**2.** It is undisputed that the Sheriff's Department did not explicitly promise that it would serve the order immediately at daybreak on the morning of August 9, 1994.

**3.** Teressa was apparently traveling toward the junkyard to dispose of some of her own belongings.

upon which our conclusions are based include the Governmental Tort Claims and Insurance Reform Act and the Public Duty Doctrine, set forth separately below.

## II. The Governmental Tort Claims and Insurance Reform Act

The Governmental Tort Claims and Insurance Reform Act, West Virginia Code 29–12A, was enacted by the legislature in 1986 "to limit liability of political subdivisions and provide immunity to political subdivisions in certain instances. . . ."[4] The Act explicitly does not apply to State action, specifying that "State" does not include political subdivisions. W. Va.Code § 29–12A–3(e)(19).[5]

We are asked to address the implications of section 29–12A–5(a) of the Act, providing political subdivision immunity in seventeen specific instances, as follows:

Immunities from liability

(a) A political subdivision is immune from liability if a loss or claim results from:

(1) Legislative or quasi-legislative functions;

(2) Judicial, quasi-judicial or prosecutorial functions;

(3) Execution or enforcement of the lawful orders of any court;

(4) Adoption or failure to adopt a law, including, but not limited to, any statute, charter provision, ordinance, resolution, rule, regulation or written policy;

(5) Civil disobedience, riot, insurrection or rebellion or the failure to provide, or the method of providing, police, law enforcement or fire protection;

(6) Snow or ice conditions or temporary or natural conditions on any public way or other public place due to weather conditions, unless the condition is affirmatively caused by the negligent act of a political subdivision;

(7) Natural conditions of unimproved property of the political subdivision;

(8) Assessment or collection of taxes lawfully imposed or special assessments, license or registration fees or other fees or charges imposed by law;

(9) Licensing powers or functions including, but not limited to, the issuance, denial, suspension or revocation of or failure or refusal to issue, deny, suspend or revoke any permit, license, certificate, approval, order or similar authority;

(10) Inspection powers or functions, including failure to make an inspection, or making an inadequate inspection, of any property, real or personal, to determine whether the property complies with or violates any law or contains a hazard to health or safety;

(11) Any claim covered by any workers' compensation law or any employer's liability law;

(12) Misrepresentation, if unintentional;

(13) Any court-ordered or administratively approved work release or treatment or rehabilitation program;

(14) Provision, equipping, lawful operation or maintenance of any prison, jail or correctional facility, or injuries resulting from the parole or escape of a prisoner;

(15) Any claim or action based on the theory of manufacturer's products liability or breach of warranty or merchantability or fitness for a specific purpose, either expressed or implied;

(16) The operation of dumps, sanitary landfills, and facilities where conducted directly by a political subdivision; or

(17) The issuance of revenue bonds or the refusal to issue revenue bonds.

W. Va.Code § 29–12A–5.

We are asked, as specified in the certified questions above, to address subsections

---

**4.** As noted in *Randall v. Fairmont City Police Dept.,* 186 W.Va. 336, 412 S.E.2d 737 (1991), the history of West Virginia political subdivision immunity includes "broad, often total, abrogation by the judiciary of the state common-law local governmental tort immunity, followed soon thereafter by the enactment of governmental tort claims legislation, typically providing in sub-

stance for a broad reinstatement of local governmental immunity from tort liability."

**5.** Political subdivisions, as separate and distinct entities from State government, are not entitled to benefit from the State's constitutionally imposed sovereign immunity. *See* W.Va. Const. art. 6, § 35.

(a)(3), execution or enforcement of an order, and (a)(5), method of providing police and law enforcement, and the implications of the special relationship exception to the public duty doctrine.

### III. The Public Duty Doctrine and the Special Relationship Exception

■■ A concise definition of the common law public duty doctrine was presented in *Randall v. Fairmont City Police Department*, 186 W.Va. 336, 412 S.E.2d 737 (1991), as follows: "[t]he public duty doctrine is that a local governmental entity's liability for nondiscretionary (or "ministerial" or "operational") functions may not be predicated upon the breach of a general duty owed to the public as a whole; instead, only the breach of a duty owed to the particular person injured is actionable." *Id.* at 346, 412 S.E.2d at 747.[6] As explained in *Randall*, "[i]n the context of an alleged failure of a local governmental entity to provide any, or sufficient, fire or police protection to a particular individual, the local governmental entity's duty is defined at common law by the public duty doctrine." *Id.*

■■ The public duty doctrine is separate and distinct from the principle of immunity. It "does not rest squarely on the principle of governmental immunity, but rests on the principle that recovery may be had for negligence only if a duty has been breached which was owed to the particular person seeking recovery." *Parkulo v. West Virginia Board of Probation and Parole*, 199 W.Va. 161, 172, 483 S.E.2d 507, 518 (1996). In other words, the public duty doctrine "is not based upon immunity from existing liability. Instead, it is based on absence of duty in the first instance." *Holsten v. Massey*, 200 W.Va. 775, 782, 490 S.E.2d 864, 871 (1997). Where the public duty doctrine would apply, there is simply no duty and therefore no need to inquire as to the existence of immunity. The public duty doctrine is not a "doctrine of governmental immunity but one of tort, based on the initial question

applicable to any negligence action, that is, whether the defendant owes the plaintiff any judicially cognizable duty." *Reno v. Chung*, 220 Mich.App. 102, 559 N.W.2d 308, 311 (1996) (Ludington, Judge, dissenting).

■■ A component of the public duty doctrine at common law was the special relationship exception, providing that the law enforcement entity, while not owing a duty to the general public, does have a duty toward individuals with whom the law enforcement entity has established a special relationship. "If a special relationship exists between a local governmental entity and an individual which gives rise to a duty to such individual, and the duty is breached causing injuries, then a suit may be maintained against such entity." Syl. Pt. 3, *Benson v. Kutsch*, 181 W.Va. 1, 380 S.E.2d 36 (1989). The New York courts have extensively explored the special relationship exception and concluded as follows in *Cuffy v. City of New York*, 69 N.Y.2d 255, 513 N.Y.S.2d 372, 505 N.E.2d 937 (1987):

> Indeed, at the heart of most of these "special duty" cases is the unfairness that the courts have perceived in precluding recovery when a municipality's voluntary undertaking has lulled the injured party into a false sense of security and has thereby induced him either to relax his own vigilance or to forego other available avenues of protection. On the other hand, when the reliance element is either not present at all or, if present, not causally related to the ultimate harm, this underlying concern is inapplicable, and the invocation of the "special duty" exception is then no longer justified.

*Id.* at 375, 505 N.E.2d 937.

■ Syllabus point two of *Wolfe v. City of Wheeling*, 182 W.Va. 253, 387 S.E.2d 307 (1989), provides guidance on the determination of whether a special relationship exists in a given factual scenario:

> To establish that a special relationship exists between a local governmental entity

---

**6.** As an illustration in *Randall*, we explained that the "duty to fight fires or to provide police protection runs ordinarily to all citizens and is to protect the safety and well-being of the public at large; therefore, absent a special duty to the plaintiff(s), no liability attaches to a municipal fire or police department's failure to provide adequate fire or police protection." 186 W.Va. at 346–47, 412 S.E.2d at 747–48.

and an individual, which is the basis for a special duty of care owed to such individual, the following elements must be shown: (1) an assumption by the local governmental entity, through promises or actions, of an affirmative duty to act on behalf of the party who was injured; (2) knowledge on the part of the local governmental entity's agents that inaction could lead to harm; (3) some form of direct contact between the local governmental entity's agents and the injured party; and (4) that party's justifiable reliance on the local governmental entity's affirmative undertaking.

*Id.* at 254, 387 S.E.2d at 308, syl. pt. 2.

### IV. Applicability of Section (a)(3) Immunity to the Factual Scenario Presented in the Case Sub Judice

■■■ The first certified question, as quoted above, asks whether the special relationship exception to the public duty doctrine applied to West Virginia Code § 29–12A–5(a)(3). Implicit in that question is an assumption that section (a)(3) is triggered by the facts existing in this case. As concisely explained in *North Side State Bank v. The Board of County Commissioners of Tulsa County,* 894 P.2d 1046 (Okla.1994), "the government's statutory immunity from tort liability depends on the function being performed at the time in question...." 894 P.2d at 1050. A section (a)(3) scenario, in its most literal form, would entail an alleged negligent action occurring during "the execution or enforcement" of a lawful order of a court. The chronological confines of "the execution or enforcement" have not been clearly delineated. For (a)(3) to apply to the present case, one would have to assume that "the execution or enforcement" begins when officers have knowledge of the order to be subsequently enforced.

Yet, the officers in the case sub judice were not engaged in the execution or enforcement of the lawful order. On the contrary, their precise alleged impropriety was their *failure* to engage in the execution or enforcement of this mental hygiene order in a timely fashion, i.e., as *failure* to provide police or law enforcement addressed by subsection (a)(5). The contention that both (a)(3) and (a)(5) apply to these facts is somewhat imprecise and incongruous. The (a)(5) prong of the argument asserts that the officers failed to enforce; yet, the attempt is also made to conform to (a)(3) by alleging that the negligent act occurred during the execution or enforcement. Only through unreasonably broad interpretation of (a)(3) is such an analysis imaginable.

Under the facts of the present case, we do not believe that (a)(3) is applicable. At the time of the alleged negligent activity, these officers were not engaged in the execution or enforcement of a lawful order of a court. On the contrary, they had failed to act, and it is their *failure* to act that allegedly caused the ultimate harm. The defendants acknowledge in their brief that "[e]stablishing priorities for the performance of the various duties assigned to law enforcement agencies and officers obviously constitutes the *'method of providing* police [or] law enforcement ... protection[,]*'* " an (a)(5) analysis. The defendants also state that "the plaintiff's cause of action is based upon decisions made regarding how many deputies were needed on the morning of the accident to perform the various duties required; where those deputies were to be assigned; and what tasks were to receive priority. These decisions are at the heart of the *'method of providing* police [or] law enforcement protection[.]*'* "

*"Failure to act"* and *"method of providing"* were phrases specifically identified by the legislature in (a)(5), and it is exclusively (a)(5) which applies to this case. If we were to permit (a)(3) to apply where the police have received notice of an order *but have not yet executed it,* immunity would become extremely broad and would traverse well-beyond the scope envisioned by the legislature.

■■■ Consequently, we conclude that certified question one is unnecessary to the decision of this case. " ' "In a certified case, this Court will not consider certified questions not necessary to a decision of the case." Syllabus Point 6, *West Virginia Water Serv. Co. v. Cunningham,* 143 W.Va. 1, 98 S.E.2d 891 (1957).' Syllabus Point 7, *Shell v. Metropolitan Life Ins. Co.,* 181 W.Va. 16, 380 S.E.2d 183 (1989)." Syl. Pt. 5, *Anderson v. Moulder,* 183 W.Va. 77, 394 S.E.2d 61 (1990).

Therefore, we dispense with certified question one without additional discussion.

### V. Certified Question Two: The Special Relationship Exception to the Public Duty Doctrine

As explained above, where an individual can demonstrate that a special relationship existed between that individual and the governmental entity, such special relationship will create an exception to the public duty doctrine. The determination of whether such special relationship exists is "ordinarily a question of fact for the trier of facts." Syl. Pt. 3, in part, *Wolfe*, 182 W.Va. at 254, 387 S.E.2d at 308. Syllabus point two of *Wolfe*, quoted above and reiterated here for convenience, specifies the requirements for the establishment of a special relationship, as follows:

> To establish that a special relationship exists between a local governmental entity and an individual, which is the basis for a special duty of care owed to such individual, the following elements must be shown: (1) an assumption by the local governmental entity, through promises or actions, of an affirmative duty to act on behalf of the party who was injured; (2) knowledge on the part of the local governmental entity's agents that inaction could lead to harm; (3) some form of direct contact between the local governmental entity's agents and the injured party; and (4) that party's justifiable reliance on the local governmental entity's affirmative undertaking.

*Id.* at 254, 387 S.E.2d at 308, syl. pt. 2.

The Walkers contend that the evidence is sufficient to present a jury question regarding the existence of a special relationship, and we agree. They maintain that the involved officers had knowledge of the dangerous situation and the potential for flight or self-destructive action by Teressa. The Walkers further contend that the officers had discussed these issues with the family and mental health facility and were clearly cognizant of the necessity for immediate action. While providing no commentary on the desirable or preferable ultimate conclusion of the jury regarding the existence of a special relationship or the negligence of the officers, we find that the evidence regarding the existence of a special relationship is sufficient to justify jury resolution of this matter. We express no opinion regarding the ultimate disposition of this case or whether there was any negligence by the officers in the handling of this matter; we simply answer the certified questions posed, finding that section (a)(3) does not apply to the facts of this case and that the section (a)(5) inquiry, pursuant to *Randall* does require jury analysis of whether a special relationship exists.

Having addressed the certified questions, this matter is hereby dismissed from the docket of this Court.

Certified questions answered; case dismissed.